**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 24-24831-CIV-TORRES

TROY BEDICHEK, and
ABBY BEDICHEK,

*Plaintiffs*,

v.

ROYAL CARIBBEAN
INTERNATIONAL,
and ROYAL CARIBBEAN
CRUISES, LTD.,

*Defendant*.

_______________________________________/

***ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT***

This matter is before the Court on Defendants', Royal Caribbean International and Royal Caribbean Cruises, Ltd.'s (collectively, "RCL"), motion for summary judgment, which is now ripe for disposition. [D.E. 55]. Plaintiff Troy Bedichek sued RCL after falling seriously ill with Legionnaire's disease on the fifth day of an RCL cruise. He claims that RCL's water system made him sick and that RCL should have seen that danger coming. RCL says no and moves for summary judgment because its Legionella samples were negative, no passenger contracted the disease aboard the ship before him or with him, so he was probably exposed at home, at work, or at a motel the night before he sailed. Because all Plaintiff's allegations must be accepted as true and all inferences cast in his favor, we find that Plaintiff has produced enough

disputed material evidence that points the other way, including RCL's own water safety records that show that RCL's safety criteria were not followed.

Defendant's motion is therefore GRANTED in part and DENIED in part. It is granted as to Counts III and IV, which Plaintiffs no longer pursue. It also granted as to Count V for lack of further case or controversy. But it is DENIED as to Count I.

## *I. BACKGROUND*

Plaintiff Troy Bedichek, along with his wife (Plaintiff Abby Bedichek) and daughter, embarked on a December 2023 cruise on Royal Caribbean's Adventure of the Seas. [D.E. 54 at 3 ¶ 1]. The Bedichek family holiday cruise went off without a hitch for the first four days, but on the fifth day, Mr. Bedichek began to experience a low-grade fever and body aches, which caused him to forego the shore excursion for that day he had planned with his family. [*Id.* at 4 ¶¶ 19, 21]. By nightfall on the fifth day of the cruise, Mr. Bedichek's symptoms had progressed into difficulty breathing. [*Id.* ¶ 21].

On the sixth day, Mr. Bedichek, determined to go on that day's shore excursion with his family, took a painkiller and disembarked for St. Maarten, but was nonetheless experiencing fatigue, lethargy, aches and pains, and difficulty breathing. [*Id.* ¶ 23]. By the seventh day, Mr. Bedichek was thoroughly unwell and immediately set off towards the medical center onboard the Adventure of the Seas upon waking up that morning. [*Id.* ¶ 24]. But before Mr. Bedichek could reach the onboard medical center, he collapsed and fell unconscious. [*Id.* ¶ 25]. He awoke in the medical center, actively receiving medication for his heartrate. [*Id.*]

The physician treating Mr. Bedichek, Dr. Anel Pelser, M.D., performed a urinalysis, which returned positive for Legionnaires' disease. [*Id.* ¶ 26]. Mr. Bedichek's condition continued to worsen, which led Dr. Pelser to inform Mrs. Bedichek of the possibility that she may have to intubate Mr. Bedichek, who soon fell into a coma. [*Id.* ¶¶ 26–32].

Mr. Bedichek was soon so ill that the ship diverted to Grand Turk so that he could be medically evacuated back to the United States to receive treatment, which he did at Broward County Hospital in Fort Lauderdale, Florida. [*Id.* ¶ 33]; [D.E. 67 ¶ 33]; [D.E. 54-2 at 63:14–64:13]. Mrs. Bedichek and their daughter remained on the ship through the end of the cruise. [D.E. 54-2 at 64:12–13]. Before disembarking, Mrs. Bedichek signed a promissory note for $7,178.39 regarding payment to RCL for the medical care provided to Mr. Bedichek while onboard. [D.E. 54 ¶ 35].

After treatment, Mr. Bedichek survived his illness but alleges that he "continues to suffer from severe neurologic damage" as a result of the event. [D.E. 1 at 4 ¶ 21]. These are uncontested facts in this case. But, of import here (and disagreement between the parties), the question is *how* Mr. Bedichek contracted Legionnaires' disease.

Plaintiffs generally allege that, "[w]hile a passenger aboard Defendants' vessel, Troy Bedichek was exposed to and breathed in, inhaled or consumed *Legionella*-contaminated water causing him to contract Legionnaires Disease" and that "[t]he source the *Legionella*-contaminated water was the water system of Defendants' vessel, *Adventure of the Seas*." [D.E. 1 at 6 ¶¶ 32–33].

While there may be other touchpoints of Mr. Bedichek's exposure to water allegedly containing Legionella bacteria, at least two are particularly identified in the parties' briefing, and serve as examples if not moments of possible contraction: (1) Mr. Bedichek's standing in a hot tub with his daughter on the first day of their cruise, which he alleges had an oily, odorless, slick substance on the side [D.E. 54 at 3 ¶¶ 3–5]; and (2) Mr. Bedichek's being the first person in his cabin to shower for that cruise, during which he experienced a foul odor [*Id.* ¶¶ 12–14]. In any event and on the continuum of water-involving interactions Mr. Bedichek may have had while onboard *Adventure of the Seas*, Plaintiffs allege[1] that Mr. Bedichek's Legionnaires' disease was due to negligence on the part of RCL, whether failing to properly maintain; test; warn; inspect; or otherwise. [D.E. 1 at 9].

Defendants, in the motion for summary judgment now before us, reject these allegations, not only because they argue that RCL made no such negligent failures, but also because there were other sources of possible contagion, such as Mr. Bedichek's place of work (he is a paramedic) and the Days Inn motel the family stayed

[1] Plaintiff's complaint brings five claims in total, four against RCL and one against now-dismissed Defendant Dr. Pelser: Count I – negligence of Royal Caribbean Defendants; Count II – negligent medical care – Anel Pelser, M.D.; Count III – negligent medical care – Royal Caribbean Defendants – actual agency; Count IV – negligent medical care – Royal Caribbean Defendants – apparent agency; and Count V – declaratory judgment regarding the promissory note – Royal Caribbean Defendants. [D.E. 1 at 7–19]. Count II was voluntarily dismissed in February 2025. [D.E. 20, 21]. Plaintiffs, in their response to the motion for summary judgment, "consent[] to the dismissal of vicarious liability claims arising from onboard medical malpractice allegations against RCL's employee, Dr. Pelser." [D.E. 68 at 18]. Accordingly, we will enter judgment for RCL on counts III and IV, given Plaintiffs' consent. That leaves only Counts I and V.

in the night before the cruise, which "had no water safety plan; no Legionella testing records or reports; and no records of maintenance, cleaning, flushing, chlorination, shock treatment, or other remedial measures for its water system." [D.E. 54 at 12 ¶ 92].

With the record set post-discovery and the case hurtling towards trial, the question before us now is whether there is a genuine issue of material fact as to whether RCL was negligent in how it handled its water system relative to passenger safety from Legionnaires' disease aboard the *Adventure of the Seas* during that December 2023 cruise.

## *II. GOVERNING PRINCIPLES*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In both moving for and opposing summary judgment, arguments "that a fact cannot be or is genuinely disputed must [be] support[ed]" by:

> [C]iting to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or[] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

However, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Further, the burden is placed on the moving party to establish "both the absence of a genuine material fact and that it is entitled to judgment as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). All reasonable doubts must therefore be resolved in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

But to overcome a motion for summary judgment, the non-movant must nonetheless show—not based solely on the pleadings, but by citation to "materials in the record"—that specific facts exist that demonstrate a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial") (internal quotations omitted). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," as "the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "A court need not permit a case to go to a jury[] when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 592-94). "Where the evidence is circumstantial, a court may grant

summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the non-movant's claim rests." *Id.*

## *III. ANALYSIS*

### *A. <u>Count I – Negligence of Royal Caribbean Defendants</u>*

Maritime law governs actions arising out of alleged torts, such as these, committed aboard a cruise ship sailing in navigable waters. *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1320 (11th Cir. 1989). "In analyzing a maritime tort case, we rely on general principles of negligence law." *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)[2]. To prove negligence, a plaintiff must show that (1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm. *J.F. by & through S.F. v. Carnival Corp.*, 141 F.4th 1164, 1168 (11th Cir. 2025) (citing *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012)).

#### *1. Whether RCL Owed a Duty*

As to prong one and a defendant's duty, "the benchmark against which a shipowner's behavior must be measured is ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition[.]" *Keefe*, 867 F.2d at 1322. "'In determining the existence of a duty a court must examine

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decision of the Fifth Circuit rendered before October 1, 1981.

and weigh the probability of an accident, the potential extent of the injury, and the cost of adequate precautions.'" *Fuentes v. Classica Cruise Operator Ltd, Inc.*, 32 F.4th 1311, 1317 (11th Cir. 2022) (quoting 1 Thomas Schoenbaum, Admiralty and Maritime Law § 5:4 (6th ed. & 2021 update)) (alteration omitted). All said, because "[i]n this circuit, the maritime standard of reasonable care usually requires that the cruise ship operator have actual or constructive knowledge of the risk-creating condition," *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1286 (11th Cir. 2015), any potential liability for the Royal Caribbean entities "hinges on whether it knew or should have known about" the risk-creating condition. *See Keefe*, 867 F.2d at 1322.

"A maritime plaintiff can establish constructive notice with evidence that the 'defective condition exist[ed] for a sufficient period of time to invite corrective measures.'" *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019) (quoting *Monteleone v. Bahama Cruise Line, Inc.*. 838 F.2d 63, 65 (2d Cir. 1988)) (alteration in original). "Alternatively, a plaintiff can establish constructive notice with evidence of substantially similar incidents in which 'conditions substantially similar to the occurrence in question must have caused the prior accident.'" *Id.* (citing *Jones v. Otis Elevator Co.*, 861 F.2d 655, 661–62 (11th Cir. 1988)).

RCL's argument is twofold: (1) it could not have actual notice, because there were no reports or other evidence of someone contracting Legionnaires' disease on the preceding *Adventure of the Seas* cruise; and (2) it did not have constructive notice because there was no evidence that Legionella bacteria was present with sufficient time to begin corrective measures, and there were no substantially similar incidents

sufficient to give RCL notice of Legionella bacteria being present. [D.E. 55 at 8–9]. Plaintiffs argue in return that RCL had both actual and constructive notice, largely because there have been prior cases of Legionnaires' disease on RCL vessels, generally, and because RCL did not explicitly follow its own water management policies. [D.E. 68 at 3–15]. Both parties' arguments put far greater emphasis on constructive notice, so we will follow suit and begin there.

First, though, some framing would be helpful. For this, *Carroll v. Carnival Corporation*, 955 F.3d 1260, 1264 (11th Cir. 2020), is informative. In *Carroll*, the plaintiff fell and sustained injuries after tripping over a lounge chair set up in a narrowed walkway. *Id.* at 1263. The plaintiff then sued for negligence, alleging in part "that Carnival negligently maintained a dangerous condition—'lounge chairs that narrowed and protruded onto a pedestrian walkway'—and negligently failed to warn passengers of the danger associated with that condition." *Ibid.*

In finding the plaintiff's negligence claims could withstand summary judgment, *Carroll* emphasized that evidence of a correction action can establish notice of such a condition:

> As in *Guevara* and *Sorrels*, a reasonable jury could view this testimony [from Carnival employees that part of their practice was to take corrective action and move lounge chairs that were blocking the walkway][3] as evidence that Carnival has taken corrective measures—i.e., adopting a policy of keeping the chairs in-line and/or in the upright position and instructing employees to ensure that they are not blocking the walkway—due to a known danger.

---

[3] There was additional testimony from the assistant chief security officer that, "because passengers sometimes pull out chairs and do not put them back in place, they can create an 'unsafe condition,' so it is part of the staff's duties to take corrective action and remove that hazard." *Id.* at 1266 (citation to record omitted).

*Id.* at 1266. In other words, Carnival knew that chairs were moved, with at least some regularity, in a manner that caused them to block walkways and, thus, create a possible "unsafe condition." And Carnival, in response, created the corrective action of requiring employees to be on the lookout for chairs that were in a walkway so that they could then move them back out of the walkway. So, Carnival knew of a possibly unsafe condition and created a corrective action plan to deal with that condition. The *Carroll* court concluded on that basis that a reasonable jury could view that as having taken corrective action measures sufficient for notice. *Ibid.*

As applied here, RCL's "Water Safety Plan M/S [']Adventure of the Seas'" ("WSM") [D.E. 53-5] suggests a similar corrective action response. First, one of Plaintiff's proffered experts, Dr. Arthur Diskin, is an emergency medicine trained physician who spent eight years as RCL's global chief medical officer and fifteen years in a more limited, but similar role at Carnival Cruise Lines. [D.E. 62-6 at 5:16–22, 68:12–22]. At his deposition, Dr. Diskin testified that there were cases of Legionella bacteria exposure associated with hot tubs on Royal Caribbean ships, and that "[a]nything that aerosolizes the water source would be a known exposure," including showers. [*Id.* at 74:15]. And Dr. Diskin also testified that, during his time at RCL, he was involved in investigations into to the source of Legionella bacteria contamination after a guest had been diagnosed with Legionnaires' disease. [*Id.* at 75:19–78:1].

We note, however, that for *Adventure of the Seas*, all semi-annual, third-party testing for Legionella contamination was negative prior to Plaintiffs' cruise, and had

been since 2022. [D.E. 55 at 9]. But it is also true that, as a general matter, the possibility of Legionella contamination in particular cruise ship amenities or facilities (e.g., a hot tub) and the existence of prior cases of Legionnaires' disease having been diagnosed on RCL cruises were known factors to Defendants.

This is supported by the content of the WSM—in this case, tailored to *Adventure of the Seas* and dating back to 2019. [D.E. 53-5]. RCL characterizes the plan as follows:

> Created in 2019 by a third-party engineer, the plan established a comprehensive risk assessment and management approach that encompasses all steps in potable water, laundry water, technical, and recreational water supply from bunkering and production to the consumers onboard.

[D.E. 55 at 11]. It is "indisputable," they say, that RCL had this water safety plan. [*Id.*] And being that it dates to 2019, we agree. [D.E. 53-5 at 1].

By way of example of items that are accounted for in the WSM, Appendix 2, beginning on [D.E. 53-5 at 59], includes various tables, the first of which is a "Potable Water risk assessment." Table 1 includes, on page 3, a line item for the event, "Contamination with legionella bacterias [*sic*]," for which the "control measure" portion reads:

> Due to high fatality rate for legionella, which is 40-80%, regular sampling of the potable water is recommended at least every 6 months. Free chlorine level in PW distribution system must be between 0.2-2 ppm, cold PW temperature must be below 25 deg.C and hot PW temperature must be above 50 deg.C.

[*Id.* at 63]. The line item has what appears to be the second highest "RISK" rating, eight, and is highlighted in bright red. [*Id.*] The only item rated higher is "Hot PW temperature too low," with a nine—also in red. [*Id.*]

Exhibit A to Plaintiffs' response is a Bates-stamped "Weekly Potable Water Tank Monitoring" log, produced by RCL. [D.E. 68-1]. It spans several months and years, but, importantly, has data for December 2023 and surrounding months. [*Id.* at 10]. For the testing dates of December 2, 8, 15, 22 (i.e., Plaintiffs' boarding date), and 29, 2023, literally all recorded temperatures for all water tanks are not in the range required by the WSM. [*Id.*] Whether the potable water being tested is hot or cold is functionally immaterial—all of it falls in a range of 30 to 40 degrees Celsius, which is outside of either required scope. [*Id.*]

For its part, RCL argues in the motion that RCL uses chlorine *instead of* thermal regulation:

> Under the water safety plan, Royal Caribbean has two options for combatting Legionella growth: chemical or thermal.[] But both relevant experts opined that thermal methods—meaning keeping all cold water under 25 degrees Celsius and all hot water above 50 degrees—are impractical because it is nearly impossible to control the temperature of potable water at all relevant times without risking other issues such as scalding.[] Royal Caribbean thus uses chlorination, and both Dr. Krause and Dr. Clancy agree that chlorination is sufficient when properly dosed, as detailed in Royal Caribbean's water safety plan.

[D.E. 55 at 12]. And, indeed, the same Exhibit A shows chlorine levels between 0.2 and 2 ppm for all tested dates in December 2023. [D.E. 68-1 at 10].

For this proposition, they cite the depositions of their experts and pages 16 and 17 of the WSM ([D.E. 53-5 at 20–21)]. [D.E. 55 at 12]. But that is not necessarily what the text of the WSM actually says:

> **10.1.2 Non-fecal related illness**
>
> **Legionella:**
>
> The genus **Legionella** is a pathogenic group of bacteria that includes several species. **Legionella pneumophila** has only been found in aquatic systems. On board ship legionella may be found in: swimming pools, whirlpools and potable water system[s]. Legionella pneumophilla causing Legionellosis (all illnesses caused by Legionella) including a pneumonia type illness called <u>Legionnaires' disease</u> and a mild flu like illness called <u>Pontiac fever</u>. Transmission is airborne via respiratory droplets containing the bacteria.
>
> **Legionella control**
>
> Control of *Legionella* growth can occur through chemical or thermal methods. The more expensive of these two options is temperature control, i.e. <u>keeping all cold water below 25 °C (78 °F) and all hot water above 50 °C (124 °F).</u>
>
> Legionella temperature control scale:
>
> - 25 to 45 °C (77 to 113 °F) – Growth range
> - **32 to 42 °C (90 to 108 °F)** – Ideal growth range
> - 48 to 50 °C (118 to 122 °F) – Can survive but do not multiply
> - At 50 °C (122 °F) – 90% - die in 80-124 minutes
> - At 60°C (140 °F) – 90% - die in 2 minutes
> - Above 70 °C (158 °F) – *Legionella* dies almost instantly
>
> **Legionella chemical control**
>
> On board "Passenger Ship" an automated system[] is installed for halogen-based disinfection and pH control dosing. Amounts injected must be controlled by flow meters or free halogen and pH analyzers.
>
> 1. SWIMMING POOLS 1-5 ppm
> 2. WHIRLPOOLS 3-10 ppm
> 3. INTERACTIVE RWF 2-5 ppm

> For systems with significant *Legionella* problems, temporary shock chlorination—where levels are raised to higher than 2ppm for a period of 24-hours or more and then returned to 0.5 ppm—may be effective. Hyper-chlorination can also be used where the water system is taken out of service and the chlorine residual is raised to 50 to 100 ppm or higher at all points for 24-hours or more.
>
> The system is then flushed and returned to 0.5 ppm chlorine prior to being placed back into service. These high levels of chlorine will penetrate biofilm killing both the *Legionella* bacteria and the host organisms.

[D.E. 53-5 at 20–21].

Indeed, the WSM indicates that Legionella bacteria can be controlled through either method, but there is no actual indication that, e.g., both could not occur, or that RCL ships use only one option—including the *Adventure of the Seas*. This is true particularly when compared against the "Potable Water risk assessment table," which appears to require both—including with the temperatures list as a "must"-type required item. [*Id.* at 63 ("Free chlorine level in PW distribution system must be between 0.2-2 ppm, cold PW temperature must be below 25 deg.C and hot PW temperature must be above 50 deg.C.")].[4] And, further, almost every recorded temperature in the table at [D.E. 68-1 at 10] for the testing dates in December 2023, is within the 32 to 42 degrees Celsius range, which the WSM identifies as the "Ideal growth range" for Legionella bacteria. So, while it may be that chlorine alone can control such growth, the text of the WSM pertaining to Legionella and control thereof

[4] Also, WSM guidance for "Potable water sampling for legionella," includes a table for "action level following positive legionella samples in hot and cold-water systems." [D.E. 53-5 at 15–16].

is not nearly as clear-cut as RCL's argument suggests, especially when compared to the real-world data from, e.g., [D.E. 68-1 at 10]. And that is the record before us that we must account for on summary judgment.

This is all to say, RCL is keenly aware of the danger of Legionella bacteria. The WSM mentions twice that Legionella has a "high fatality rate" of "40-80%." [*Id.* at 16, 63]. Coupled with the fact that RCL has had prior cases of Legionella growth on cruise ships, including to the point of patient diagnosis with Legionnaires' disease, and the fact that RCL has a whole WSM that is a "comprehensive risk assessment and management approach that encompasses all steps in [water sources]" [D.E. 55 at 11], it simply cannot be said that RCL was unaware of the generally existing risk of Legionella growth. And as compared to the deck chairs in *Carroll*, it appears very much that a reasonable jury could look at the extensive planning around Legionella bacteria and its known dangers and consider it "as evidence that [RCL] has taken corrective measures . . . due to a known danger," 955 F.2d at 1266. In other words, RCL, like Carnival in *Carroll*, was aware of a potentially recurrent danger and implemented a plan to control it. That plan, to a jury, could well be evidence of corrective action in response to a known danger.

RCL frames the danger too narrowly: no positive sample and no prior case aboard the ship. In fairness, Plaintiffs frame it too broadly: RCL has known for years that Legionella poses a threat to passengers. The Eleventh Circuit, however, has effectively rejected both approaches. A cruise line need not have known of "the particular puddle" that caused an injury, but general awareness of a hazard

writ large" is not enough either. *J.F. ex rel. S.F. v. Carnival Corp.,* 141 F.4th at 1171 (harmonizing *Brady v. Carnival Corp.,* 33 F.4th 1278, 1281-82 (11th Cir. 2022)). Corrective action counts as notice only if there is "a connection between the [corrective action] and the danger." *Id.* at 1172 (quoting *Guevara,* 920 F.3d at 721).

The question, then, is not whether RCL knew that Legionella exists in fresh water; everyone knows that, and RCL knows that more than most. The question is whether RCL knew, or should have known, that the potable water aboard the *Adventure of the Seas* tended to sit at temperatures in which Legionella grows during a relevant time period. A reasonable jury could find that it did. After all RCL wrote the thresholds itself. The water safety plan for this ship lists Legionella contamination among its highest-rated risks and states that cold potable water "must be below 25 deg.C and hot PW [temperature] must be above 50 deg.C." [D.E. 53-5 at 63.] The same plan identifies 32°C to 42°C as the bacterium's "[i]deal growth range." [Id. at 20.] This record evidence, coupled with Mr. Bedichek's testimony and the circumstantial evidence that he became sick several days after first being on the ship, "is such that a reasonable jury could return a verdict for the nonmoving party." *Doe v. Carnival Corp.*, No. 24-13159, 2026 WL 2491151, at *4 (11th Cir. Aug. 25, 2026) (quoting *Bowen v. Manheim Remarketing, Inc.,* 882 F.3d 1358, 1362 (11th Cir. 2018)).

RCL also measured the results itself. Its weekly logs for December 2, 8, 15, 22, and 29, 2023 record every tank outside both thresholds, [and nearly every reading inside the ideal growth range]. [D.E. 68-1 at 10.] This is not general awareness of a general risk. It is the ship's own record of the ship's own water, measured against the

ship's own standard, during the weeks Mr. Bedichek was aboard. A condition documented week after week in the defendant's own logs is one that "exist[ed] for a sufficient period of time to invite corrective measures." *Guevara,* 920 F.3d at 720 (citation omitted).

We agree, of course, that there is substantial evidence in the record from which the trier of fact could reach a different conclusion. But RCL's responses highlighting this evidence only address its weight, not its sufficiency. Its samples were negative, but they were taken twice a year (the last about three weeks before the sailing), and a jury could decide that two snapshots a year do not rule out, more likely than not, bacteria growth in water logged in the "growth" range week after week.

Similarly, its experts say chlorination alone controls Legionella when properly dosed, and the logs show free chlorine within the plan's range. [D.E. 55 at 12; D.E. 68-1 at 10.] Perhaps so. But the plan RCL adopted states that chlorine levels and temperatures "must" both be met. Which account to believe is a question of fact.

And, what's more, the danger was not exclusive to only the prior ships affected. RCL itself notes that, "[v]irtually all freshwater on Earth has Legionella, but it is infectious only above certain levels and when water is aerosolized." [D.E. 55 at 9]. Even taking for granted that there was no actual notice, we find unpersuasive RCL's argument that, *as a matter of law,* it had no constructive notice, in light of Defendants' clear acknowledgement—including specifically relative to *Adventure of the Seas* (given its WSM is in the record)—of the general dangers of a Legionella outbreak. The fact that semi-annual testing from 2022 on did not detect such an

outbreak is but one factor in the calculus. *Adventure of the Seas* still had at least several of the possible contamination points, from potable water and showers to hot tubs and pools—at least some of which, if not all, are common to the entire RCL cruise ship fleet. And the WSM, in myriad ways, accounts for danger relative to Legionella in all of these. A "high fatality rate," in fact.

Again, "[t]o plead negligence, a plaintiff must allege that (1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." *Chaparro*, 693 F.3d at 1336 (citation omitted). As to prong one, whether RCL had a duty to protect Mr. Bedichek from a Legionella outbreak, we find that a reasonable jury could find—at least—the foregoing as evidence that RCL should have taken corrective action due to a known danger that its own records evidence occurring at the time Plaintiffs boarded the ship. *See Carroll*, 955 F.3d at 1266. Because a reasonable jury could find constructive notice on this basis, we do not reach actual notice or Plaintiffs' prior-incident theory.

***2. Whether RCL Breached its Duty***

Having found that there is sufficient question of material fact that a reasonable jury could conclude that RCL had a duty to protect Plaintiffs from Legionella bacteria, we move on to prong two: breach.

RCL argues that even if there were a genuine issue of material fact as to notice, it cannot be held liable because there is now showing of negligence: "Plaintiffs, despite alleging about ten theories, have failed to adduce any evidence from which a jury

could infer that Royal Caribbean was actually negligent." [D.E. 55 at 10]. Those theories are as follows:

- Failing to properly maintain its vessel's water supply which allowed *Legionella* bacteria to develop and flourish;
- Failing to properly clean and disinfect its vessel's water supply and water tanks which allowed *Legionella* bacteria to develop and flourish;
- Failing to test, or properly test, the water in its vessel's water supply and water tanks which allowed *Legionella* bacteria to develop an flourish;
- Failing to inspect, or have inspected, the water and the water tanks in its vessel's water supply which allowed *Legionella* bacteria to develop and flourish;
- Failing to detect or discover that the *Legionella* bacteria had developed and flourished in its vessel's water supply and its water tanks;
- Failing to warn passengers, including Troy Bedichek, of the danger in using its vessel's water supply which contained and exposed passengers to the *Legionella* bacteria.
- Failing to follow the Centers for Disease Control and Prevention guidelines and/or regulations to prevent *Legionella* from developing and flourishing in its vessel's water supply;
- Failing to have, or failing to properly implement, a Water Management Program for its vessel's water systems and all devices that use water;
- Failing to comply with the Vessel Sanitation Program (VSP);
- Failing to act as a reasonable and prudent person would under the same or similar circumstances[.]

[D.E. 1 at 9].

RCL does not dispute that, for instance, failing to implement a water management program could be a breach of its duty of reasonable care. But it argues that no evidence shows it failed to do so. [D.E. 55 at 11-13]. The evidence already addressed above answers that challenge. A reasonable jury could credit the tank logs to find that RCL did not maintain the temperatures its own plan required. Or that jury could credit RCL's expert who testifies that chlorination made those

temperatures irrelevant. Choosing between those accounts is the jury's job. *See Carroll,* 955 F.3d at 1266 (conflicting testimony about the cruise line's own policy "demonstrates that there is a dispute of material fact, making summary judgment inappropriate"). We need not decide whether Plaintiffs' other theories of breach would survive on their own, assuming they choose to present them in whole or in part. We only find that in this record there is enough evidence of a duty and a breach to get to the jury.

Accordingly, in light of the genuine questions of material fact in this record in the light most favorable to Plaintiffs, a reasonable jury, if it finds that RCL owed a duty to Plaintiffs, could find that RCL then breached that duty.

### ***3. Causation***

RCL also challenges the third prong of negligence, causation, as Plaintiffs "merely speculate that Troy Bedichek contracted Legionnaires' disease onboard the vessel." [D.E. 55 at 13]. It is again worth noting that here, too, RCL's own briefing undermines that argument: "Given the incubation period and symptom onset [of the disease, which is two to fourteen days], it is possible that Troy Bedichek contracted Legionnaires' disease from his home, his workplace, the Days Inn in St. Augustine, the shower or hot tub on Adventure of the Seas, or a portside location during the cruise." [*Id.* at 14].

RCL is certainly correct that possibility is not proof. A temporal link between an exposure and effect, standing alone, "would not ordinarily be sufficient to prove a causal relationship." *Hendrix ex rel. G.P. v. Evenflo Co.,* 609 F.3d 1183, 1201 n.12

(11th Cir. 2010) (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005)). Where proof of causation is circumstantial, summary judgment is proper if "no reasonable jury may infer from the assumed facts the conclusion upon which the non-movant's claim rests." *Mize,* 93 F.3d at 743. So, the question for summary judgment purposes here is whether Plaintiffs offer more than timing.

They do. Expert Chillingworth attributes the infection to the cabin shower, and Dr. Clancy concludes that Mr. Bedichek was exposed aboard the ship. [D.E. 54-6 at 43, 80-81; D.E. 54-5 at 207-09]. Their opinions rest on the incubation window; the foul odor from the shower on its first use; and the growth-range temperatures in the ship's own logs. Their expert testimony, if credited, would offer the jury more than just timing; it presents a causation theory that could, more likely than not, have resulted in exposure onboard the vessel. So Plaintiffs do, in fact, have more than just temporal relationship to support their case.

RCL's counterevidence is admittedly also substantial: negative samples before and after the voyage; no illness in any other passenger, including Mr. Bedichek's wife and daughter; and other possible sources within the incubation period. [D.E. 54 ¶¶ 9, 51–52, 81–95.] A jury may find that evidence persuasive. But RCL's objection to all the evidence amassed by Plaintiffs, e.g., that Plaintiffs' experts did not "properly consider[]" the alternatives [D.E. 55 at 14], goes largely to the weight of their opinions. It is a matter for cross-examination (or possibly a Rule 702 motion) not for summary judgment. Because a reasonable jury could find that exposure aboard the Adventure of the Seas caused Mr. Bedichek's illness, causation is for the jury.

In summary, Plaintiffs have demonstrated genuine issues of material fact as to, at least, the WSM and the effects of its management and implementation as relative to a duty of care. If a reasonable jury were to find a duty and breach, causation is not beyond the pale. Given that (1) Mr. Bedichek fell ill on the fifth day of his cruise; (2) he had two exposures to water on *Adventure of the Seas* from day one of his cruise (hot tub and shower); and (3) the incubation period could be as little as two days, all added to the conflicts in evidence generated by RCL's failure to comply with their own water management plan, we cannot find as a matter of law that no reasonable jury could not find either actual or proximate causation.

Accordingly, and as the parties do not dispute the fourth prong of actual harm having befallen Plaintiffs, Defendants have not carried their burden for summary judgment on Plaintiffs' negligence claim.

### *B.* ***Count V – Declaratory Judgment***

The only remaining claim, Count V, regards the $7,178.39 promissory note that Mrs. Bedichek signed regarding Mr. Bedichek's medical care while onboard the *Adventure of the Seas*. [D.E. 1 at 18]. Plaintiffs argue that it should be declared "invalid and unenforceable due to duress, material misrepresentation, unjust enrichment, fraudulent inducement and other defenses to be proven at trial." [*Id.* at 18–19]. Defendants argue that the Court should grant summary judgment on Count V because it is moot, in that Mr. Bedichek's insurance covered the cost, so the Bedicheks have not actually lost that money sufficient to claim it now. [D.E. 55 at 19]. Plaintiffs argue in return that Defendants have no knowledge as to whether

insurance paid the entire value of the note or otherwise produced evidence that it has been cancelled. [D.E. 68 at 19]. They further contend that the insurer would have a right of subrogation regarding the note, which would allow the insurer to recoup any money it paid on the promissory note from any moneys paid out to the Bedicheks in this lawsuit. [*Id.*]. In the end, Plaintiffs say, "[t]he final result is that the Bedicheks would still end up paying some or all of the promissory note. That is why it is essential that this Court decide on the validity of the promissory note at trial." [*Id.*]

We disagree on this point that Plaintiffs have a case or controversy redressable on a declaratory judgment claim. A request for declaratory relief stays alive so long as "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273 (1941)).

By that measure Plaintiffs have not shown a live controversy as between RCL and them. They presented no facts to dispute the evidence submitted by RCL that they admitted that payment had been made on their behalf by Cigna. Nor did they dispute the authenticity or reliability of the record of payment by Cigna for the amount owed to a "foreign provider." [D.E. 54-13]. So for purposes of this separate claim, with payment made for the cost of a helicopter and medical care, there is nothing for the court to declare viz-a-viz the Bedicheks. And certainly no fact issue for the jury to determine because Plaintiffs have now not been harmed by a purportedly duress-laden agreement.

To the extent that Plaintiffs claim they may still suffer risk from subrogation from the insurer, a declaratory judgment action is neither necessary nor appropriate. They can certainly claim as a damage amount under the negligence count that part of their medical expenses included this reimbursement. And under the collateral source rule that Florida follows, that is entirely appropriate because, they claim, the expense was due to the tortfeasor's negligence. *See, e.g., Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1311 (11th Cir. 2020) ("It is also well established that the collateral source rule – both in its substantive and evidentiary roles – applies to maritime tort cases.").

Hence RCL is correct that this count, and the purported contract formation theories it sought to present in this negligence case, is now moot at least for purposes of a declaratory judgment action. *See, e.g., Ahearn v. Mayo Clinic*, 180 So. 3d 165, 169 (Fla. 1st DCA 2015) ("Ahearn's first count was for breach of contract. As to Ahearn individually, this became moot upon Mayo Clinic's waiver and agreement to pay attorney's fees. 'An issue is moot when the controversy has been so fully resolved that a judicial determination can have no actual effect.'"); *Provident Life & Acc. Ins. Co. v. Transamerica-Occidental Life Ins. Co.*, 850 F.2d 1489, 1491 (11th Cir. 1988) ("Courts have found the case or controversy requirement lacking when the plaintiff has no interest in the case, when the defendant has no interest in the case, when no conflict exists in the case, when there is no adverse claimant, when there is no conflict in the case because of a defect in the parties and when there is no legal relationship between the parties.").

Accordingly, we will grant summary judgment as to Count V for lack of a case or controversy, and with the caveat that the entry of this judgment does not foreclose Plaintiffs from including the amount reimbursed by an insurance company as part of the damages recoverable under their negligence claim.

## *IV. CONCLUSION*

For the reasons set forth above, and per the parties' consent for full Magistrate Judge disposition of the action [D.E. 87, 88], Defendants' motion for summary judgment [D.E. 55] is hereby **GRANTED in part and DENIED in part**:

1. The motion is DENIED as to Count I.

2. The motion is GRANTED on Plaintiffs' consent as to Counts III and IV.

3. The motion is GRANTED as to Count V on the declaratory judgment action.

4. To the extent the pending motions for leave to file supplemental memoranda [D.E. 112] and motion for hearing [D.E. 114] related to the issues raised in the motion for summary judgment, that relief is DENIED as moot. The motions remain pending on the docket as to other matters.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 25th day of September, 2026.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge